The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Please be seated. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. And the clerk did her job perfectly and I asked you to sit down too soon. I apologize, I don't usually preside. In any event, we're happy to have you here today. Our first case is Magaly Hernandez v. Fairfax County. Ms. Reyno. Good morning. May it please the Court, Ellen Reyno for the Appellant Plaintiff Maggie Hernandez. Her name is Magaly, but she goes by Maggie, so that's how she's referred to in the record and that's how I'll refer to her. This is a case that needs to go before a jury. There are issues of fact abound. First, with regard to whether the environment was sufficiently hostile, we need to look to the Supreme Court decision in Harris v. Forklift, where the Court said that if a workplace is permeated with intimidation, ridicule, or insult, then sufficient to make the employment situation abusive, that is a hostile work environment. We don't need to only have sexual harassment. We've got some of that in this case, but the main thing we have really is intimidation. Intimidation in the form of tracking her whereabouts, calling current and prior supervisors, asking about her interactions with others, documenting that she allows other male employees, her coworkers, to be friendly and have some physical touching where she might hug a person she hasn't seen in a long time. He's documenting that. He's also documenting how frequently she works with her superior officer, Battalion Chief Zosh. There seems to be some confusion, or maybe you can clear this up, as to exactly what your client knew with respect to a lot of this activity? Well, she knew that he was keeping tabs on her through Telestaff. She knew that he was keeping documents on her, and she knew that because Battalion Chief Zosh told her that, told her that she saw the documentation. Now, Ms. Hernandez did not see the documentation, but she heard about it. She also knew that from another firefighter that he had installed audio and video equipment in his office at the fire station, which is an office that is shared by other people. It's the place where you can go to work on a computer. I thought that was done consistent with certain policies that allow that kind of activity. Well, it may be consistent with certain policies, but in this situation where you have a gentleman who has not taken no for an answer when he's trying to hug you, when he's cornering you by the medic unit, blocking your path, so you can't go down the hallway. In a small hallway, he did this, and he's her superior officer, so now she knows that in addition to asking people about her, he is tracking her whereabouts through the Telestaff system, which also is legal, but it's also legal to be on a public street. But if you're following a woman down the public street because you want to see what men she interacts with, that would still be harassment. It doesn't matter that you're allowed to be on the public street. Yes, he's allowed to record and he's allowed to check Telestaff, but it's supposed to be for business purposes. He's supposed to be checking Telestaff to make sure that staffing is complete. He's not supposed to go outside of his area and look to see where Maggie Hernandez is. What evidence are you relying on for the element of the claim that this conduct was imputable to the county? Well, first, the county had investigated and had complaints against Captain Brule six or seven times. Guy Morgan, who was an investigator with the department for some years, said he investigated claims of harassment and stalking by Captain Brule five or six times, and that there was one before he came on board. The timeline is tricking me. That was all before Ms. Hernandez started working with Captain Brule? Yes, years before, and he had stalked his ex-fiancee. Guy Morgan had found that he'd lied about what he did with regard to his girlfriend's ex-husband. He actually called all over Manhattan looking to see where the girlfriend's ex-husband was staying and canceled his hotel reservation, pretending. And the county knew about all of this before Ms. Hernandez got here? Yes, they knew it all. They never disciplined him. In fact, Captain Brule testified with glee at his deposition that he got no discipline for any of those infractions. And mind you, because he's a quasi-law enforcement officer, his off-duty conduct like this is important because he's going into people's homes. He's also supervising women overnight. They're allowing him to do this. There is a case of negligent retention in the Fourth Circuit. Where did I write that down? But that isn't your claim here, is it? I'm sorry? Well, the imputing standard is similar to negligent retention. We have to show that they were negligent in the way they handled his behavior. You're saying the levels of discipline while progressive were grossly insufficient? Is that what you're maintaining? Well, there was no discipline for the first seven, six or seven investigations. Right, no, no, I'm talking about with regard to Ms. Hernandez. But you're also supposed to prevent harassment. Here you have a man that you can see his propensity is to not take no for an answer. When his girlfriend breaks up with him, he calls her repeatedly, stalks her, sits outside of her house, scares her kids. You know this and you allow him access to female subordinates in an overnight environment where people have to depend on each other for their lives. So it's similar to the negligent retention standard. I mean, we don't have the burden of showing they should have fired him, but we do have just a burden of showing that it was negligent the way they handled it. And it was negligent not to give him any discipline for those earlier incidents. The earlier incidents, I'm just trying to figure out kind of how they factor into the argument you're making. I mean, is the idea that a reasonable jury could find that in light of this prior knowledge of what Captain Brewerly does both on and off the job, that maybe the first time they hear he's touching her sexually and he won't stop, even though she keeps asking him to stop, right then it was negligent not to do something more than just talk to him? That's one thing they could find. They could find that it was negligent not to discipline him right away for that. They could also find it was negligent not to discipline him when Guy Morgan found that he had lied and that he had harassed his ex-fiancée. How does the fact that your client initially suggested that she did not want to take this any higher than talking to, I guess, initially when she talked to her supervisor? I think that's a factor to be weighed. One reason why she didn't want to have it go any higher is because she saw other women being retaliated against. She says that that was her reason for asking Chief Zosh to just let it stay at the station level and just talk to him. Was that made public to the employer? I mean, you're talking about her internal thought process there, right? You're saying that they are not negligent because that was her request? Right. Okay. Well, initially that was her request. But then, you know, July came and there was a request that he go for a fitness for duty. There was a request that he be transferred to a different station where he could be supervised more closely. Those requests were denied. Let me ask you this. So back to Judge Harris's question, but for the fact of this prior history, do you concede that the sort of the graduated steps that the employer took in this case would have been sufficient? Absolutely not. So it doesn't matter? That just aggravates the situation, but it would not matter? You know, it's for a jury, and so I think we would present both things to a jury that, you know, they could have stopped his behavior in the beginning before she ever came to work with him. They could have stopped his behavior when he first started harassing her. And then, you know, you say it's progressive discipline, but if you actually see what they did. Well, I mean, that's what the district court characterized it as. They did. But if you look at the facts, they just gave him warning after warning after warning. Like, just focus on your duties, they tell him, and he takes that as well. It's not taking away from my duties to do this tracking, so I'm going to continue to do it. Because in his warped mind, he thinks that they're having an inappropriate relationship, and that's his claim, and that's what he's telling them, that he's investigating them. So he thinks that he can track them to support his own claim. But in the meantime, he's telling everyone that he's doing this. He's telling the other firefighters, and so they're getting a negative view of Maggie Hernandez. People start to think that she is having a relationship with a superior officer. They think she's gay, which she's not. And they think that she's getting favorable treatment. This puts her in a dangerous situation. She has to go into fires and into dangerous medical situations where she needs to depend on her coworkers. They need to trust her. They don't need to be thinking that she's not trustworthy and she's got a relationship with retaliation. Actually, just before you go to retaliation, I just want to pause on one thing you said. The district court says there were these escalating responses, but you're suggesting that at least if you read in the light most favorable to Ms. Hernandez, which we have to, that at least the first two times, the first two things the district court is pointing to, nobody actually tells him, stop harassing Maggie Hernandez. They say, stop doing it to the extent it interferes with your work. And in his deposition, he's like, well, that's fine. It's not interfering with my work, so I think I can keep going. So the district court perhaps erred in not viewing those first two interventions in the light most favorable to Ms. Hernandez? Well, there were really three interventions. First, Battalion Chief Zosh tells him to stay away from Maggie, and he takes that and twists it into, well, Maggie likes to hug other men, so she's not really offended by me hugging her, so let me document that. So that was ineffective. Then, yes, two other times he's told, cease investigations of matters related to your prior assignment that negatively impact or distract from your current assignment. That's what he's told in November. And he takes that in his favor and says, well, it's not distracting me, so I'll just continue to do it. Meanwhile, he's got binders this big, which Guy Morgan testified he was able to just flip through the binders and tell you where Maggie Hernandez was on a certain day and who she hugged and what she ate for dinner that day. I also observed that in his deposition, that he could specifically recall times when she hugged a certain male firefighter and joked with him and put her arm around him. He remembered all that. This is, like, after he's left the fire department. So, I mean, Morgan observed that. The investigator observed that. He relayed that to management. He told management that he thought that really had a, well, he says it's OCD, but really what he's saying is that he was compulsive, that he couldn't. Excuse me, I don't mean to interrupt, but I hate to have you lose your opportunity. Okay, retaliation. Retaliation. Okay, I'll switch to it. I think here in this situation we have pretext evidence, but we also have statements. Chief, the fire chief, said that the reason he couldn't warn Maggie Hernandez that he was about to give a reprimand to Brulee was that she had lawyered up. Those are his words. That has a negative connotation towards the fact. When did that occur? When was that statement made? That statement, it was made just before Brulee got his reprimand, so it must have been the beginning of March of 2015. Well, what are you alleging? I mean, what does the record show? Well, the record just shows that he was not giving her a warning that Brulee was about to get a reprimand, and the reprimand occurred in early March. So, by inference, it was even earlier in March that he warned Chief Szasz and told her that he couldn't contact Maggie Hernandez to warn her because she had lawyered up. There's different ways to take that, but a jury can certainly take that as, I don't like Maggie Hernandez anymore as an employee because she's lawyered up. There was also a statement that lawyers were involved. Right. That's Bowers to Cawson, right? No. No, that's Roach to Flanagan. Deputy Chief Roach is under Cawson. Okay, but wasn't there a lawyers involved comment made by Bowers to Cawson? Yes, Bowers. He's the fire chief. He's the one who said lawyered up. Right. Deputy Chief Roach. Okay, so what was the date of that? I don't know the exact date. All I know is that it was near the time that Brulee was about to get his reprimand, which was on March 3rd, I think. Let me just check. Right, but when did that occur with regard to the retaliation, as you allege it, against Hernandez, the written reprimand? Oh, June, June 8th. And where is that in relation to the activities of knowledge with respect to the employer? March 3rd. So that's three months? Yes. Oh, no, I'm sorry. I mean, as I understand it in the record, she gets written up in June, but that happened three months after the employer learned that Hernandez was exploring a lawsuit, ten months after she complained to the EEO office, and 13 months after the fire department first learned of her complaints. That seems like too attenuated a connection. We're not at all relying on the temporal proximity. Temporal proximity is just one way to prove causal connection. What we're relying on is the pretext and the statements. When D.C. Roach tells Captain Flanagan to give Maggie the reprimand, he says, lawyers are involved. So that's another, I mean, it's pretty directly related to the adverse action to say lawyers are involved. What does that have to do? The fact that she hired a lawyer to sue for sexual harassment, that's not supposed to have anything to do with why she's getting a reprimand. Okay. And there's also the late appearance of the reason. I'm confused by that. Well, I thought my time was up. Oh, it's going up now. My time is up. Well, you're using your rebuttal time now. Okay. So it's your choice if you want to. No, I'll preserve my rebuttal time. Thank you. Okay, thank you very much. Thank you very much. Ms. Greenswag. Good morning. May it please the Court, Shami Greenswag for the appellee, Fairfax County. Counsel has identified for you all a number of very salacious allegations. And even if there was admissible evidence regarding these events, and in large part there's not, they really have no bearing on this case. And that's in large part because Maggie Hernandez wasn't aware of them. And it's really just an attempt to distract this Court from that which is really at issue here. And that's what Judge Trenga focused on. What was Ms. Hernandez not aware of? Well, first, she wasn't aware of all the issues that Brule had with his ex-wife or his ex-fiance. I mean, the point is that the employer was aware of it. Yes. Well, there's two reasons that those things aren't relevant, though. In terms of, to the extent that Hernandez attempts to rely on those things to say that he did in fact create a severe or pervasive work environment, obviously those events don't tend to show that. But also, those events are totally dissimilar to that which is being claimed here. So the fact that John Brule acted as a private investigator for his girlfriend to find out whether or not her husband was having an affair has nothing to do with whether he was monitoring the on-duty work activities of Maggie Hernandez. And so the district court was able to make pretty short work of those allegations because it really doesn't matter. And if you look at the record. Saying it's not relevant to any discipline that the county should have taken because it had knowledge of these past incidents, that perhaps they would raise a red flag as to being more aggressive in its initial discipline vis-à-vis Brule's comments with regard to Hernandez. That's correct, Your Honor. Because these events are so dissimilar, they have no bearing on. For example, there was two sustained findings from the Internal Affairs or Professional Standards Office. One was that he acted inappropriately vis-à-vis his girlfriend's estranged husband because he was trying to find out whether or not he was having an affair. And the second is that he called his ex-fiance too many times after she broke up with him. And there is evidence in the record that in connection with the second incident, he was required to submit to a fitness for duty evaluation. But if the fire department goes about disciplining people because of issues that they have off-duty, domestic issues, 50% of the population would be in a pretty bad spot if that was the standard. I think the allegation is not that they should have disciplined him for that. It's that in light of the fact that he was harassing this other woman when he started harassing Ms. Hernandez, red flags should have been raised. Like this might not be the average case where we'll just tell him to stop and he'll stop because he's got a problem with this kind of behavior. Well, yes, Your Honor. So let's look at what it is that happened here. So there's allegations that John Brule, he made two comments about wanting to see her in a bathing suit in connection with inviting everybody to a pool party. He said that she couldn't handle a big hose. He touched his chin to her shoulder. And when she brings those incidents to the county's attention on April 29, 2014. You're sort of skipping ahead because first she, each time, right, at least the allegations, each time she brings them to him and says, please stop doing this. She does exactly what we say women should do. She does it and he won't stop. So that's part of the picture, right? But what he's doing is he's invading her personal space. And so when the district court looks at it and he says objectively, most people don't think of that as severe or pervasive harassment, that somebody's standing too close to you. Nevertheless, when she does complain about it to Chief Zosh, and she says, you know, Chief Zosh, I want you to handle this at the station level, it's Maggie Hernandez's testimony that it was appropriately handled by Chief Zosh. And furthermore, after that, after the discussion that Chief Zosh has with Maggie Hernandez and John Brule, and she says, keep your hands to yourself, keep two arms lengths away, don't make inappropriate comments. It's undisputed that he never again made any inappropriate comments or touched her inappropriately, got too close to her. He maintained a strictly professional relationship after that point. Except for the part where he, again, we have to look at the evidence in the light most favorable to Ms. Hernandez, that he ostracizes her and starts a rumor that she's having a lesbian affair with the supervisor who is the person who talked to Captain Brule. That seems, that factors in. Yes, Your Honor. The first thing I would say about that is that he didn't say that she was having a lesbian affair. And if you look at the portions of the record that are cited by Hernandez, it consistently reflects that he says that she had an inappropriate relationship with Chief Zosh. And the follow-up question. The implication. No. It seems to me you're making a jury argument to us. No, Your Honor. You're arguing the facts. And I think it would be better if you did it more in a legal structure. Because it's striking me why we shouldn't believe their evidence. And it's really not, I don't think it's really germane to what we have in front of us here. Yes, Your Honor. What Judge Trenga did was he looked at cases from this circuit as well as sister circuits to say, is the conduct alleged here as objectively severe as that that has been allowed to go to a jury? And he found correctly that it was not. And he asked, you know, it's not reflected in the briefs. There's no brief, in the briefs there's no evidence of any case law that reflects that the conduct of this nature rises to the level of severe pervasive harassment that should be able to go to a jury. And Judge Trenga, in his memorandum opinion, as well as in the county's briefs, we cite to a plethora of case law that has repeatedly held the conduct of this nature does not rise to the level of severe pervasive harassment. When it occurs in the context of that electronic monitoring slash stalking, you know, the fact that these actions occurred and here this person then was doing this intensive research into her movements. I mean, it seems to me that we've got to consider the two together. Yes, Your Honor. And so the note taking, what do we have there? It's not stalking. It's not tracking. There's no allegation that he's following them, that he's peeping in their windows or going to their houses. He's not even keeping track of what they're doing off-duty. He's not leaving them nasty messages. There's no allegation of any inappropriate comments or contact whatsoever. He's holed up in his office behind a desk. Am I remembering the record right? Is there evidence that Ms. Hernandez was told that he was tracking when she used the bathroom? She testified that he never made any comments to her regarding her bathroom use. The notes are included in the record. There's no notes that reflect him keeping track of her bathroom use. There's nothing about that in the record. And so she testifies that at some point in July, that's the only time she hears about the notes, is that at some time in July of 2014, Chief Zosh tells her, John Brule is keeping track of what you do around the station. At that time or shortly thereafter, Maggie Hernandez is detailed temporarily to another station after John Brule makes a hostile work environment complaint, saying that Maggie Hernandez is being disruptive and insubordinate around the station, and that she's engaging in that behavior because she's unable to do so because Chief Zosh is letting her do it. And she never returns to John Brule's supervision after that point, and after that conversation with Zosh in July, she never again hears about the notes. It's only from Zosh that she hears any information about the notes, and that's in July of 2014, and never again. And that was my point, Your Honor, is that John Brule is sitting in an office making notes to himself about what it is that Maggie Hernandez is doing on duty, but she doesn't know about it. And so how does that affect her work environment? And the answer to that is that it doesn't. Can I ask you a question about your comment about the district courts comparing this case to others? Yes, Your Honor. And I don't belie the fact that, obviously, you look to cases to decide whether or not this might fit, but it seems to me that this seems to be a very fact-specific analysis. And in two of the instances, as I recall, the district court relied on cases that dealt not at all with the kind of stalking harassment conduct that we have here. So how is that at all helpful to you? Well, what John Brule is doing is he's using telestaff, and what that is is a staffing tool to see who's sitting in what seats on the fire engine throughout Fairfax County on a daily basis. And that's a system that's open to everybody. And so he's looking at that to try to find discrepancies, improprieties in support of his hostile work environment claim. And so he's using that, and it's not stalking. It's information that he's trying to gather, again, by himself in his office. Do you think that compiling four binders' worth of the movements of Ms. Hernandez and her superior is not stalking? You don't think a jury might come to that conclusion? Well, it's because it's not stalking. Didn't your own investigator, didn't Investigator Morgan, say that it was behavior that could be construed as stalking? Morgan did, and that's a good point, is that although Morgan found that, when he gave his findings to Fire Chief Bowers, Fire Chief Bowers issued a direct order to John Brooley telling him to cease all of his activities, and he issued discipline to Brooley, telling him any future infractions could result in termination. And there's no further harassing conduct after that discipline is issued. And so the county did take increasingly corrective measures to get Brooley to stop what Maggie Hernandez is saying is harassing conduct. But it's not harassing conduct because he's just sitting in his office gathering information from a system that's public information. It's openly a film. It just seems like I totally get this as a jury argument. Go to a jury. Tell them that. And then Ms. Hernandez will say, but look, Morgan called it stalking. This just seems like there's a real factual question here about what was. But what is he doing? He's scrutinizing her work activities. That's what he's doing. He's so scrutinizing. She is told by Zosh that he is keeping track of who she's giving hugs to. Is that her work activity? At the fire station. It's things that she's doing at the fire station. And this is. Who she gives hugs to? Okay. Right. And I understand, Your Honor, and he says it's because he's, you know, that's after the meeting where he's told, you know, keep your hands to yourself. And he says, well, I thought we were supposed to keep our hands to ourselves, but Maggie Hernandez isn't doing that. And, again, I'm. Taking the activity in isolation. We can argue about whether or not collecting all this information, frankly, is kind of creepy, may not be stalking. I guess a jury can figure that out. But that's one thing. Then you have the sort of the statements regarding rumors of a lesbian relationship and the like and other innuendos. I mean, when you put it all together, why couldn't the jury come to a conclusion that this was, in fact, a hostile work environment? Your Honor, the cases that have been permitted to go to a jury have repeatedly held that this type of scrutiny and criticism have not been permitted to go to a jury. What's the case that says that this very conduct is not enough? Well, there's plenty of cases that are very similar, where you have much more egregious acts of sexual overtures and things of that nature. Maggie Hernandez was never intimidated. She was never threatened. He never contacted her. He didn't send her inappropriate pictures or things of that nature. Did I understand you to say that she was never aware of the stalking? In July. In July of 2014, Sherry Zosh said, hey, Brulee's keeping notes on what you do around the station. And after that, July of 2014, Maggie Hernandez says in her deposition testimony, was he keeping track of what I was doing at Fire Station 1, Fire Station 2, 42? I don't know. I've never seen his notes. The only person she's ever gotten information from was Zosh in July of 2014. After that, she's blissfully unaware that he's doing it. And so instead of focusing on Brulee, I'd ask that you look at what was Maggie Hernandez's work environment? What was she made to endure? And the answer to that is she has no idea that Brulee's in his office looking at telestaff records to try to say that Maggie Hernandez and Sherry Zosh are spending an inordinate amount of time together. Does she know about the rumor mongering? There's no evidence that she – well, there's no evidence that there was a rumor that he was saying she was gay. He was just saying that she was violating the SOP, which prohibits relationships that give the appearance of preferential treatment. It seems to me that what you're doing here is you really need to make the argument that construing the evidence in the light most favorable to the plaintiff, the county prevails. That's right. And I don't hear that coming from you. I still think, as Judge Harris was saying and as I remarked earlier, you're arguing the facts. You've got to take the facts in the light most favorable to the plaintiff and then tell us why you win. Yes, Your Honor. Well, and for that, Your Honor, I would point, again, there's numerous cases that have been cited in the briefs that deal with this type of conduct or conduct that's similar. I mean, you're not going to have any cases that have facts that are exactly the same. But this court, albeit in an unpublished opinion, in 2013 came out with Buchagin v. ICF International. And that's, again, a 2013 case. And in that case, you have the plaintiff's being mockingly yelled at, snide comments are being made to her, there's favorites being played with employees, repeatedly harping on plaintiff's mistakes, and, quote, unfairly scrutinizing and criticizing the plaintiff were insufficient as a matter of law to get to a hostile work environment claim. And that's what we have here. Unfairly scrutinizing and criticizing the plaintiff. That's what this amounts to. And in Hawkins v. PepsiCo, this court said that you've instructed your district courts that they shouldn't engage in a judicial review of the quantity and quality of workplace criticism. And so even if he was going around saying, you know, she's having a lesbian affair, there's no evidence that he did. But there's cases out there where, you know, people are sending inappropriate photos and they're touching people inappropriately and groping them and things of that nature, and it still doesn't get to the level of a hostile work environment that gets to a jury. And so what we have here, again, you know, Brule sitting in his office trying to build evidence of a case, it's not enough. And then even if it was, the district court found that the county took reasonable and appropriate corrective measures. And if I may, I'd like to address that. Again, it was Hernandez's own testimony that Zosch's response to the April 29, 2014 complaint was appropriate. And it was. It dealt with the issue, never happened again after that. The issue doesn't come to the county's attention again until July 24th of 2014. At that time, Brule makes a hostile work environment complaint saying that Zosch is being disruptive and insubordinate. And they tell him, again, yes, informally, focus on being a shift leader. You don't supervise her anymore. She's been removed from your chain of command. Don't worry about it. On August 18th. Just so we're clear, in the light, sort of construing that evidence in the light most favorable to Ms. Hernandez, they don't say stop tracking her, stop harassing her. Well, at that point, it's not clear that that's what he's doing. He's making complaints against her and they're saying, look. They're saying, look, focus on your work. Yeah. Focus on your job. They don't say leave her alone. Right. And in 2020 hindsight, had they known that he was going to, in the future, engage in this kind of intense scrutiny, maybe they would have. But as Judge Trenga correctly notes in his opinion, corrective measures don't require a standard of perfection. They don't go, the district court doesn't go and micromanage. I'm just looking for the part where they say leave her alone. Sure. Stop harassing her. Sure. Well, he's not, he's not bothering her. What he's saying at this point, he's tracking me. And they go to him and say, not stop doing that. They say, focus on your job. But she never complains about that. She doesn't complain that he's tracking her because she doesn't know that it's happening. I guess she does, right. In July, she knows that he's keeping track of what it is that she does around the station. Isn't that part of her complaint in August? Am I remembering the record wrong? Yes, that's right. And so in August 2014, she files the over-up complaint. And there's no dispute that the county has broad anti-harassment policies. And so August 18, 2014, there's an extensive intake interview process that's completed. The county interviews nine witnesses and comes out with a 21-page report detailing its investigation and findings. In August 2014, the fire department relieves John Brule of duty, puts him on administrative leave, and makes him go meet with Dr. Stewart, who's the medical director for the Occupational Health Center. Because of what he's doing to Ms. Hernandez? At Zosh's request, yes. Zosh says, I'm concerned about Brule. Actually, I don't think he's psychologically sound to be doing this job. And they go and they make him meet with Dr. Stewart. Correct? I'm sorry? And they say this is because of what you're doing to Ms. Hernandez. I think that that's the fair implication. There would be no other reason for him to do it. He does see the intake form that Sherry Zosh has drafted, which reflects that that's the reason that he's being made to meet with Dr. Stewart. And he tells Dr. Stewart, I disagree with 90% of what's included in this report. Nonetheless, that's the reason he's made to meet with Dr. Stewart, who tells him, you know, I find you fit to return to duty. I don't think you pose a threat to anyone else. And he returns him to duty. In October of 2014, they transfer John Brule involuntarily to another station across the battalion to work on a different shift. In November, they catch wind that he's still complaining that he's not the problem in the 2nd Battalion, that Hernandez and Zosh are. And so they issue him a directive, a written directive. This time it's more formal, and they say, cease the investigation. In mid-February, it comes to the fire chief's attention that he had. Can we go back to cease the investigation? This is the November one? Yes, Your Honor. So it says, cease all investigation that negatively impacts or distracts your focus on your assignment and duties. Yes. So it's not cease the investigation. It's cease the investigation to the extent it's taking away time from your focus on your work. And I would, again, ask that you make sure. But at this point, right, I have to construe this in the light most favorable to Ms. Hernandez. The question is, could a reasonable jury look at that and say, they really should have dropped that second part and just said, knock it off? Yeah, but I think at this point you're kind of, it's, again, it's, you have to view everything in the context of, is there a better way that they could have said it? Had they known that he was going to. That's my question. Could a reasonable jury have thought, you know what, put the period after cease all investigation of Ms. Hernandez and drop out the part that says to the extent it has a negative impact on your assignment and duties? Well, again, I think that goes to Judge Treng's opinion. He says that, you know, we may not have been perfect, but corrective measures don't require that standard. My concern is that the district court, in describing this, I think as a broad directive to stop harassing Ms. Hernandez, didn't really read it in the light most favorable to the plaintiff, kind of subsumed the jury's function there in deciding whether, in fact, this communication did tell Mr. Brule to stop doing what he was doing. Well, I think that he, could it have been more strongly worded? Yes, it could have been more strongly worded. But, again, Judge Treng looks at it in the context of, you know, they're making real-time decisions, and so you're not going to go back and second guess every business decision that they've made. And, furthermore, when they discover that he's not followed that directive, they issue a written reprimand for it. And the fire chief himself issues a directive saying, you know, any further activity could result in your termination. And there's no harassing conduct after that point. What about the retaliation? This strikes me as it's one of those things that almost jumps off the page. Here you have her playing basketball, and there's some argument over whether the hoop is stable, and she gets disciplined for confronting one other person who's playing basketball, and her right to promotions, or her right to be considered for promotions, is then severely limited time-wise. This just doesn't seem to wash with, I mean, this seems to create a really significant issue of fact for the jury, because how do you explain the severity of the reprimand vis-à-vis the conduct? Why isn't that something a jury needs to decide? Yes, Your Honor, and I want to acknowledge that the red light is on, so I'd ask that I be permitted to respond to your question. Yes. Your Honor, the answer to this question is, in terms of the severity of the discipline, we're talking about a reprimand here, which is the lowest form of discipline. Right, but she couldn't be considered for promotion. For how long was it? For one year. Right. That's pretty significant, isn't it, plus a reprimand on your permanent record? Well, it's for three years, yes. Yeah, okay. So why isn't that pretty significant for just arguing with somebody over whether a To me, it just seems like it cries out for a jury to decide whether the county was doing this in retaliation, rather than actually they were concerned about her actions on the basketball court. Except that, Your Honor, Maggie Hernandez herself acknowledged wrongdoing, she admitted her misconduct, and she offered full and sincere apologies all around, because she knew that what she had done was wrong. She confronted this gentleman in a very aggressive way. He felt threatened. He made a workplace violence complaint that was investigated. She didn't touch him the way Brulee touched her, right? All she did was confront him on the basketball court. Yes, but he felt threatened by it, and he filed a workplace violence complaint that was investigated by the Professional Standards Office. And the Professional Standards Officer investigated it, and he interviewed her. And based on statements made by her about what she did on the basketball court, him feeling threatened by her gestures, he sustained a finding of workplace violence and unbecoming conduct. I first read these facts regarding the basketball court incident, and that was just shaking my head. I'm surprised the county hasn't burned down, given all the time that's been spent on all this extracurricular activity, completely unrelated to its core mission. And I think that's part of the problem here, is that Ms. Hernandez has alleged that she was demoralized and discouraged from performing that very function because of what was happening to her by this firefighter, by her colleague, by her superior. Yeah. Well, and I understand that, Your Honor. But at the end of the day, what we have here is, you know, this court should look at what did Richard Bowers, the fire chief, rely on when he issued the written reprimand? And that's the Professional Standards finding. There's no evidence that the Professional Standards Officer had any knowledge of any protected activity by Maggie Hernandez. This is the question. You don't get into the business decisions. You just ask, was it reasonable for Richard Bowers to rely on that Professional Standards report? And there's no reason. That's not the question, right? Isn't the question whether they relied on it because of Ms. Hernandez's protected activity, not whether it would have been reasonable to rely on it in some alternate universe, but whether in this universe it's up to a jury to decide whether they actually decided to discipline her because she went like this on a basketball court because of her protected activity. But she admitted that that was wrong for her to do. She can admit that it's wrong, but that's still a separate question from does it warrant this reprimand and the year-long bar from promotion, and whether absent the protected activity they would have taken the same steps, even in light of her apology. That's right, but I don't think there's any evidence from which you could say but for the Why is this a but-for requirement? Well, in retaliation claims, it's a but-for standard that's applied. And so where you have here Even in a burden-shifting context, it's a but-for standard. Yes, there's a but-for standard. A but-for causation is the standard for retaliation claims. And so where the county has put forth a legitimate non-retaliatory reason, that being the Professional Standards investigation that was based primarily on statements made by Maggie Hernandez. I mean, otherwise you're asking the jury to determine whether or not it actually did constitute workplace violence. And I think Could a reasonable jury look at that statement? The person who issues the reprimand is asked, Why the reprimand for this behavior? And he says, All I was told is that she had a lawyer. Lawyers were involved. Isn't that something from which a reasonable jury might I'm not saying it goes one way or the other, but it seems like if you're construing the evidence in the light most statement might be something from which a reasonable jury could infer it had something to do with the fact that she had a lawyer. Well, even if it did have something to do with the written reprimand, and it didn't, because by that time, the decision to issue the written reprimand had already been made, and there were lawyers involved. She was grieving it. The county's attorney's office was involved as well. But the person who issues the reprimand, I'm sorry, I don't have the page in front of me. Sure, it's Colin Flanagan who issues the written reprimand. Right, and they ask him why, and he says, all I was told is that there were lawyers involved. And my question is not whether that proves Ms. Hernandez's case, but whether that isn't evidence that a jury might look at as direct evidence. Forget burdenship, just direct evidence of a retaliatory motive. He's asked why did you issue the reprimand, and he says because she had a lawyer. Right, but at that time, the decision to issue the written reprimand, first of all, that argument's never been raised. It's never been disputed. I didn't make it up. Isn't it in the briefs? That it's direct evidence. I think that it's agreed that the burden-shifting analysis applies here. But nonetheless, at that point, the decision to issue the written reprimand comes from Fire Chief Bowers, not from Colin Flanagan. That's just kind of a chain of command thing. Colin Flanagan's her direct supervisor, and so he issues it. But it's at the direction of Fire Chief Bowers. I'm just saying that the fact that there were lawyers involved, because there were, in fact, lawyers involved, and so him questioning should we do this or that or whatever, and he just says the lawyers are dealing with it. I don't think that it's not but-for evidence, because the but-for evidence is the professional standards report. And thank you very much. Write that up. May it please the Court. What did they know and when did they know it? Well, on August 22nd, Assistant Chief Cawson wrote notes. His handwritten notes are in the record, starting at page 300 in the Joint Appendix. And there he recounts what Chief Zosh told him about documentation and about Brule's other behaviors. They also knew on October 22nd for sure that Captain Brule was seeking notes about Maggie Hernandez from her prior supervisor. They also knew from Guy Morgan in February that he was talking to anyone who would listen about Maggie Hernandez and Sherry Zosh having an inappropriate relationship. Yes, he uses the words inappropriate relationship, but even at his deposition what he describes is they would go into the bunk room and disappear for six hours at a time. They showered together. They sat on the couch together and had their heads next to each other, all of which is disputed by my clients. But certainly people in the fire department took the inference that Maggie Hernandez was having a lesbian relationship with her second-level supervisor. And that made her work environment very hostile. With regard to retaliation, I just want to say that it's not just a question of whether Bowers accepts the professional standards report. The professional standards officer says that it was no big deal and should have been handled at the station level. But also after that there was a hearing before Chief Bowers in which the four people testified, three people testified who were present, three women who all testified that Maggie did not get very close to Firefighter Fun. It was only Firefighter Fun who alleged that she got close. Also Firefighter Fun doesn't say he was threatened. He says he was fuming. He was mad because Chief Zosh was favoring Maggie Hernandez and it was two against one. And he knew that if he hit her, he doesn't say hit her, he says he knew that if something happened it would be their word against his, so he thought it was a setup. He doesn't say he was afraid of violence. It is ludicrous to say that she deserved a written reprimand for workplace violence. But when Chief Captain Brule did all that he did after years and he gets a written reprimand. And what did she know and when did she know it? Well, she knew that he cornered her on the medic unit like this. She had to duck out. So you're going back, you're jumping back and forth. You're not talking about the retaliation anymore, you're going back to the school. I'm trying to go fast. I only have five minutes. I only have two minutes. Yes, I'm going back. You know, you're making the jury argument too. Can't you just. Well, I get to make the jury argument. No, no, no, not in front of us. You tell us why a jury could believe. Yes, a jury could. Okay, so everything I say. But not reenact the scene for us. Well, the jury is going to get to see that. The jury is going to get to see Maggie Hernandez reenact the scene and say that he cornered me, put his arms around either side of me, and I had to duck out. And this is her supervisor. And this is after she's told him she doesn't like people to get close to her. She doesn't like to be touched by her supervisor. So she knows that. She also knows about the rumors because people are telling her, hey, you know, I didn't know that you liked women. And, you know, she's feeling this from people. She also, counsel says that she was blissfully unaware of all the documentation. That's not true. It doesn't take more than one conversation for her to report to the county, as she does on page 1052, that she was told that he was watching everything I was doing, work-related or not, was being watched and documented, while no one else on the shift was subject to such scrutiny. She says that in August, and that is after Chief Zosh told her that he was documenting her whereabouts and what she was doing and what she was eating and who she was hugging. So she is aware of that. She doesn't have to be aware of every single time that he makes a note about her because, gosh, that's a voluminous amount of documentation. And so she knew that. Chief Koston knew it. So the county knew it. And from that, a jury could find that they should have stopped. They should have stopped him. They should have done whatever was necessary to get him to stop. They needed to be firm with him, not write ambiguous notes about, you know, focusing on your shift and don't do anything that distracts you. And my time is up. Okay. Thank you very much. Thank you. We'll come down to Greek counseling.
judges: Barbara Milano Keenan, Albert Diaz, Pamela A. Harris